MICHAEL WALLIN, Cal. Bar No. 240344
WALLIN & RUSSELL LLP
26000 Towne Centre Drive, Suite 130
Foothill Ranch, California 92610
Telephone: 949-652-2200
Facsimile: 949-652-2210
mwallin@wallinrussell.com

Attorneys for Plaintiffs
THOMAS I. MCKNEW and LISA A. MCKNEW

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>DAVID ALLEN WILSON,<br><br>   Debtor.<br><br>THOMAS I. MCKNEW, IV and LISA A. MCKNEW, individually and as Trustees of the MCKNEW FAMILY TRUST DATED MAY 21, 2004,<br><br>   Plaintiffs,<br><br>   v.<br><br>DAVID ALLEN WILSON,<br><br>   Defendant. | Case No. 8:23-bk-10094-SC<br>Chapter 7<br><br>Adv. Case No.<br><br>Assigned for all purposes to:<br>Honorable Scott Clarkson<br><br>**COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §523** |

-1-

Plaintiffs Thomas I. McKnew, IV and Lisa A. McKnew, individually and as Trustees of the McKnew Family Trust Dated May 21, 2004 (collectively, "Plaintiffs") hereby bring this Complaint and respectfully complains and alleges as follows:

### JURISDICTION

1. This adversary proceeding is filed pursuant to Federal Rules of Bankruptcy Procedure ("FRBP") 7001(4) (a proceeding to object to or revoke a discharge), FRBP 4004 (grant or denial of discharge) and 11 U.S.C. § 523.

2. Plaintiffs, as creditors in the underlying bankruptcy case, have standing to bring this action pursuant to 11 U.S.C. § 323.

3. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157 in that this action arises in and relates to the bankruptcy case pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division, entitled *In re David Allen Wilson*, Case Number 8:23-bk-10094-SC.

4. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and 28 U.S.C. § 157(b)(2)(J) (objections to discharge). To the extent any claim for relief contained herein is determined not to be a core proceeding, Plaintiffs consent to the entry of final judgment and orders by the Bankruptcy Court.

5. Venue properly lies in the Central District of California in that this adversary proceeding arises in or is related to a case under Title 11 of the United States Code as provided in 28 U.S.C. § 1409.

### PARTIES

6. Plaintiffs are, and at all relevant times were, creditors of David Allen Wilson.

7. Plaintiffs are informed and believe, and based thereon allege, that debtor David Allen Wilson ("Debtor") is, and at all relevant times was, an individual residing in and/or doing business in Orange County, California.

//

//

//

**GENERAL ALLEGATIONS**

8. Plaintiffs file this Complaint merely out of an abundance of caution for the following reason:

9. In 2008, Debtor filed chapter 7 bankruptcy in the Central District of California, Case No. 2:12-bk-16195-RK (the "Prior Bankruptcy Case").

10. In 2009, Plaintiffs initiated an adversary proceeding against Debtor, Case No. 2:12-ap-01317-RK (the "Prior Adversary Proceeding"). In the Prior Adversary Proceeding, Plaintiffs sought a determination that Debtor's liability to Plaintiffs was non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

11. The Prior Bankruptcy Case and Prior Adversary Proceeding were assigned to Judge Robert Kwan.

12. The Prior Adversary Proceeding came on for trial before Judge Kwan on February 2, 2012, February 3, 2012, February 6, 2012, August 30, 2012, August 31, 2012, and September 6, 2012.

13. At the conclusion of trial and post-trial briefing, the Court issued its *Memorandum Decision on Adversary Complaint for Nondischargeability of Debts* (the "Memorandum Decision") and found that Debtor's liability to Plaintiffs was non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). In addition, the Court found that Debtor's misrepresentations actually and proximately damaged Plaintiffs in the amount of $2,500,000.00, plus attorneys' fees, prejudgment interest, and costs of suit.

14. Thereafter, in April 2014, the Court entered its *Amended Judgment in Favor of Plaintiffs and Against Defendant Based on Memorandum Decision on Adversary Complaint for Nondischargeability of Debts* (the "Judgment"). The Judgment states, in pertinent part, that Debtor's liability to Plaintiffs is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and further states:

> IT IS ORDERED AND ADJUDGED that on their claim for relief under § 523(a)(2)(A) the court finds by a preponderance of the evidence that Wilson represented he would perform his contractual obligations under the Cash Infusion Agreement, including selling or refinancing his Residence or the his Office property and thus, the court finds by a preponderance of the evidence that Wilson's

-3-

misrepresentation actually and proximately damaged Plaintiffs in the amount of $2,500,000.00 plus: (1) $0.00 in attorneys' fees; (2) $845,270.35 in pre-judgment interest through February 26, 2014, accruing at $475.45 per day, and $14,587.70 in costs of suit.  *See* Judgment.

15. A true and correct copy of the Judgment is attached hereto as **Exhibit A** and incorporated herein by reference.

16. Debtor filed the present bankruptcy case on January 18, 2023 (the "Current Bankruptcy Case").

17. In the Current Bankruptcy Case, the Judgment is non-dischargeable, as a matter of law, because the Court already determined Debtor's liability to Plaintiffs to be non-dischargeable in the Prior Adversary Proceeding.  In the Current Bankruptcy Case, Debtor is collaterally stopped from arguing otherwise.

18. After Debtor's filing of the Current Bankruptcy Case, Plaintiffs' counsel requested that Debtor stipulate to the non-dischargeability of the Judgment.  As of the filing of this Complaint, Debtor has not so stipulated.  As a result, Plaintiffs initiate this adversary proceeding to obtain a determination, only to the extent such determination is necessary, that the Judgment is non-dischargeable consistent with the Judgment entered in the Prior Adversary Proceeding.

19. By way of further background, the following paragraphs summarize Debtor's conduct underlying the Prior Adversary Proceeding and the Court's entry of the Judgment:

20. Debtor is and was a developer of real property throughout the United States who regularly conducted business in the County of Orange, State of California through a variety of limited liability companies and corporations under the names of, among others, A&W Builders, Inc., A&W Builders of California, Inc., American Builders Corporation, and Parkside Ventures, LLC (hereinafter referred to as "Parkside").

21. Plaintiffs are informed and believe, and upon information and belief allege that Parkside is and was a limited liability company formed under the laws of the State of California. Parkside was principally engaged in the design, development, and planning for the conversion of a 120-unit apartment building located at 23925 Bay Avenue, Moreno Valley, California 92535 to

1 condominiums for resale to the general public and the development of adjacent real property (hereinafter referred to as the "Parkside Project").

22. From the inception of the Parkside Project, Debtor and others including, but not limited to, Benjamin Meeker, and Andre Hurst (hereinafter Wilson, Meeker, and Hurst may be collectively referred to as the "Parkside Partners") were involved in the conversion and development efforts of the Parkside Project.

23. In mid-2006, Mr. McKnew was introduced to Debtor by John Stinson who was a neighbor of Mr. McKnew and worked for Debtor. Debtor was seeking construction financing for the Parkside Project. Mr. McKnew was and still is a commercial real estate mortgage banker, so John Stinson arranged a meeting for Debtor and Mr. McKnew to meet and discuss the financing needs of the Parkside Project. At the time, Debtor represented to Mr. McKnew that the initial lenders for the Parkside, China Trust, which held a 1st mortgage and Bridge Capital, which had a 2nd mortgage on the project, had stopped funding the project and he was now seeking a new 1st mortgage lender and another equity or mezzanine lender which would act as subordinated debt secured by a 2nd mortgage.

24. In December 2006, Mr. McKnew arranged a 1st mortgage loan with United Commercial Bank (hereinafter referred to as "UCB") in the amount of $20,675,000.00 which was used to pay off China Trust Bank in the amount of $8,697,217.00. The remaining funds were to be used to finish the construction of the project. Debtor told both UCB and Mr. McKnew that the existing 2nd mortgage lender, Bridge Capital, was allegedly going to stay in the project as a junior lender subordinate to UCB. With that information, UCB funded the 1st mortgage to the title company, First American Title. However, following the UCB funding of the China Trust loan, Bridge Capital demanded to be paid off as well or else it would begin foreclosing on Debtor's assets.

25. Following this demand by Bridge Capital, UCB threatened to withdraw their funds from First American Title and not close on the transaction unless the Parkside Partners would find another 2nd mortgage lender or come up with the additional collateral to pay off Bridge Capital in the amount of $8,662,225.00.

26. Debtor offered UCB as additional collateral for the deal a lien interest in his house, his office building, and the net proceeds from the settlement of certain claims related to property located in Hawaii, which he told UCB he would obtain within 60 days.

27. UCB was dissatisfied with the collateral offered by Debtor.

28. Debtor and the Parkside Partners approached Mr. McKnew and requested that Mr. McKnew (i) continue his efforts to locate a new mezzanine lender for the project, (ii) forego his normal and customary commission on the UCB 1st mortgage and any possible 2nd mortgage loan, and (iii) join the Parkside Partners by taking an interest in the Parkside Project.

29. As an inducement to Mr. McKnew to (i) continue his efforts to locate a new mezzanine lender for the project, (ii) forego his normal and customary commission on any a new mezzanine lender found for the Parkside Project, and (iii) join the Parkside Partners by taking an interest in the Parkside Project, Debtor and the Parkside Partners represented to Mr. McKnew that Debtor would (x) provide all of the net proceedings from the Hawaii litigation to fund the Parkside Project, (y) if required, Debtor would sell his house and his office building to fund the Parkside Project, and (z) UCB would look to Debtor's substantial equity in Debtor's house, office building, and the Hawaii litigation proceeds before looking to Mr. McKnew's collateral.

30. As a further inducement to Mr. McKnew to become involved in the Parkside Project, Debtor and the Parkside Partners provided Mr. McKnew with a written appraisal of Debtor's house located at 24352 Santa Clara, Santa Point, CA 92629 (hereinafter referred to as the "residence") showing a current fair market value of $12.5 million. Debtor and his Parkside Partners further represented to Mr. McKnew that Debtor had $9.5 million in equity in his house. But for the presentation of the $12.5 million appraisal on Debtor's house, Mr. McKnew would not have become involved in the Parkside Project or assumed any liability to UCB in conjunction with the deal.

31. As a further inducement to Mr. McKnew to become involved in the Parkside Project, Debtor and the Parkside Partners provided Mr. McKnew with various personal financial statements each of which made reference to certain real and personal property assets, including without limitation, the real property located at 27926 Finisterra, Mission Viejo, California and the

-6-

232 Morningstar, Breckenridge, Colorado (hereinafter collectively referred to as the "Subject Properties"). These written financial statements showed that the Subject Properties had "equity" of at least $700,000.00.

32. As a further inducement to Mr. McKnew to become involved in the Parkside Project, Debtor and the Parkside Partners represented to Mr. McKnew that (i) between the equity in Debtor's house and office building and the cash that would be generated from the Hawaii litigation, Debtor had in excess of $9.5 million in equity or cash to apply to the Parkside deal ahead of any potential exposure to Mr. McKnew, (ii) that Debtor would sell his house and office building to maintain the loan with UCB and to fund the continued development of the Parkside Project thus avoiding potential risk and exposure to Plaintiffs in the deal, and (iii) Plaintiffs and the lenders could also look to Debtor's other real and personal property to maintain the Parkside Project.

33. Debtor's representations regarding the value of his house, the equity in Debtor's assets, and his willingness to sell his personal assets to further the Parkside Project were known to Debtor to be false when made to Plaintiffs and the lenders.

34. Mr. McKnew agreed to help Debtor by giving UCB a 1st deed of trust on his condominiums in San Francisco and Hawaii and a guarantee to keep $1 million in his stock account for the benefit of UCB for a total commitment by Mr. McKnew of $2.5 million. This was envisioned as a short-term solution until either Mr. McKnew could find a replacement 2nd mortgage lender or Debtor would pay off the 2nd mortgage from the proceeds from the Hawaii settlement and/or a refinance or sale of his other assets.

35. In reliance upon the oral and written representations made by Debtor and the Parkside Partners on or about December 10, 2006, Mr. McKnew executed the Agreement re Brokerage Account and Additional Collateral with UCB. In further reliance upon the oral and written representations made by Debtor and the Parkside Partners, Mr. McKnew continued his efforts to locate a new mezzanine lender for the Parkside Project.

36. Per the December 19, 2006 closing statement, UCB paid off Bridge Capital in the amount of $8,662,225.00 and China Trust in the amount of $8,697,217.00 for a combined total of

$17,359,442.00. The remaining funds of $3,315,558 were used for interest reserves, mechanics lien releases, real estate taxes, etc., which totaled the committed loan amount of $20,675,000.

37. Time was of the essence since the original reserve of the UCB loan had been meant to fund the construction and completion of the Parkside Project but was now being used to pay off Bridge Capital. The Parkside Project required an additional $8.5 million to finish construction.

38. It was envisioned that over the next 120-days, Debtor would receive funds from another project in Hawaii that he had pledged to UCB. The funds from the Hawaii settlement were received in the amount of $3,594,178 and Debtor refinanced his office building and used $263,272 in additional proceeds to pay down the 2nd mortgage held by UCB to $4,804,775.

39. Over the same time period, it was also envisioned that Mr. McKnew would attempt to find another 2nd mortgage lender to pay off UCB in the amount of $4,804,775. It was envisioned that, if this were not possible, Debtor would liquidate his other collateral and if there was any shortfall to UCB, Plaintiffs' collateral would be used to pay down the remaining amount of the 2nd mortgage.

40. At the request of Debtor and the Parkside Partners, in March 2007, UCB released $1.97 million to private notes and credit card bills which were never contemplated to be part of the funding for the Parkside Project. The release of said funds benefitted Debtor and the Parkside Partners to the detriment of Plaintiffs and the lenders and the ability of Parkside to continue construction to completion.

41. In March 2007, Mr. McKnew presented the partnership a proposal from Western Peaks Financial for a new 2nd mortgage in the amount of $5,500,000 which would have paid off the remaining balance of the UCB 2nd mortgage and extinguished both Debtor's and Plaintiffs' collateral agreement and the funds would have been enough to finish the Parkside Project. However, Mr. McKnew was told by Debtor that the proposal was too pricey and to continue to look for a better priced loan.

42. In approximately July 2007, Debtor, the Parkside Partners, and Mr. McKnew hammered out a new exit strategy with UCB so that UCB would start releasing funds for construction to complete the Parkside Project. In order to obtain the cooperation of UCB, Mr.

McKnew agreed to put up $2.5 million in cash and Debtor agreed to put up another $2,750,000 by December 2007 or UCB would force the sale of Debtor's house and then use these funds to complete the Parkside Project. In order to document this understanding, the parties executed the Agreement for Cash Infusion and Release of Collateral dated August 10, 2007.

43. As an inducement to Mr. McKnew to reaching an agreement with UCB on the Parkside Project loan, Debtor and the Parkside Partners expressly represented to Mr. McKnew that the equity in Debtor's house and his other real property assets would be used to maintain the Parkside Project and protect the investors' interests, if needed.

44. Throughout the negotiations with UCB and Mr. McKnew, Debtor and the Parkside Partners falsely and fraudulently represented to Mr. McKnew that Debtor would sell his house, his office building, and his other real property in order to raise cash to complete construction of the Parkside Project. Some of these representations were made in meetings with Mr. McKnew and UCB and outlined in the Agreement for Cash Infusion and Release of Collateral signed by both Debtor and Plaintiffs in August 2007.

45. Debtor identified real and personal property in his personal financial statements shown to Plaintiffs and the lenders, which written financial statements Debtor represented could be used by Mr. McKnew in his efforts to locate and secure new mezzanine financing for the Parkside Project. Part of the asset based identified by Debtor contained real and personal property which in fact Debtor now contends belongs to his wife as her sole and separate property.

46. Mr. McKnew's infusion of capital was intended for a specific purpose, specifically for UCB to continue funding the Parkside Project while giving Debtor an additional six (6) months to sell his assets so as to pay off the remaining mezzanine loan amount of $2,750,000.00. In a meeting with UCB in San Francisco on July 30, 2007, Debtor, the other Parkside Partners, and Mr. McKnew met at the bank to discuss the future of the Parkside Project. The bank verbally agreed at the meeting, and it was later put into formal agreement entitled "Agreement For Cash Infusion and Release of Collateral" and signed by the bank, Plaintiffs, and Debtor and Debtor's spouse, that if Plaintiffs would put up in cash, by September 15, 2007, in the amount of $2.5 million then the

bank would continue funding the Parkside Project and Debtor would have until December 31, 2007, to raise the additional funds.

47. Per the "Agreement Regarding Brokerage Account and Additional Collateral", signed in December 2006 between UCB and Mr. McKnew, the bank would first foreclose on Debtor's assets before looking to Mr. McKnew's collateral (not to exceed $2.5 million) if there was a shortfall on the mezzanine loan made by UCB. Debtor then asked Mr. McKnew if he would instead put up Plaintiffs' collateral first, instead of Debtor's collateral because Debtor needed time to sell his assets. Debtor specifically said he did not need such a large house anymore because his kids had moved out and it was just himself and his wife living in their home. Mr. McKnew agreed to this because Debtor said he would sell his assets immediately and Mr. McKnew was led to believe by both Debtor and the other Parkside Partners that Debtor's assets were sufficient to cover the mezzanine loan amount made by UCB.

48. By Mr. McKnew putting up his cash instead of collateral, UCB agreed to continue funding the Parkside Project until December 31, 2007. as long as Debtor would sell his assets immediately. Mr. McKnew put up his collateral by September 15, 2007, as agreed upon.

49. Debtor listed his home with a Realtor chosen by him alone on December 20, 2007, at First Team Real Estate, just 11 days before his $2,750,000.00 commitment to the bank was due. This was done over the holidays, which are typically the slowest time of year to try and sell a home.

50. On November 7, 2007, without informing Mr. McKnew or the bank, Debtor sold a home in Colorado for $670,000, none of which was put into the Parkside Project. Plaintiffs are lastly informed and believe, and upon information and belief allege that faced with such blatant disregard for the agreement Debtor had signed with both UCB and Mr. McKnew, the bank stopped funding the Parkside Project and it went into foreclosure.

51. Plaintiffs did not know of the true facts and circumstances prior to the pledge of their personal property to the lender on the Parkside Project and only learned of such facts and circumstances after they had pledged his collateral to UCB.

52. In connection with Mr. McKnew's discussions with Debtor and the Parkside Partners in early 2008, Debtor for himself and his partners in the Parkside Project provided Mr. McKnew with: (a) personal financial statements for Debtor showing a net worth of $22.0 million; (b) the Second Amended and Restated Operating Agreement of Parkside Ventures, LLC showing Debtor as having $888,000 in capital invested in the project; and (c) the appraisal of Debtor's house.

51. Debtor and the Parkside Partners knew, or should have known, as Mr. McKnew shopped the potential new mezzanine financing for the Parkside Project, that (i) the Parkside Project was at risk, (ii) Debtor had no intention of selling his house, (iii) Debtor's house did not have $9.5 million equity, (iv) Debtor did not have $22.5 million in net worth, and (v) Debtor and the Parkside Partners had misled UCB and Mr. McKnew regarding the development of the Parkside Project. Neither Debtor not any of his partners informed Mr. McKnew of such facts.

52. The financial information supplied by Debtor and the Parkside Partners to Plaintiffs and the lenders was false and unreliable and known to Debtor and his partners to be false. Mr. McKnew could not have discovered the falsity of Debtor's misstatements and fraud until after Mr. McKnew posted his collateral with UCB.

**FIRST CLAIM FOR RELIEF**

[Objection to Debtor's Discharge of Debt - 11 U.S.C. § 523(a)(2)]

53. Plaintiffs repeat and re-allege each of the prior allegations in this Complaint as set forth above.

54. 11 U.S.C. § 523(a)(2)(A) provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt — (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition …

55. To induce Plaintiffs to invest the sum of $2.5 million as Plaintiffs' contribution to the Parkside Project, to pledge their personal assets to UCB to support the Parkside Project's development, and to forego Mr. McKnew's commission on the acquisition of potential new

mezzanine financing for the Parkside Project and his finder's fee on the mezzanine financing and other sums, Debtor and the Parkside Partners purposefully, falsely, and fraudulently misrepresented the financial information provided to Plaintiffs and the lenders and failed to inform Plaintiffs and the lender of, among other things, the existence of the true value of Debtor's home, Debtor's intention to sell his house to finance the Parkside Project, Debtor's intention to liquidate his other real estate and personal property assets as set forth herein above.

56. Plaintiffs reasonably and justifiably relied upon the representations made by or on behalf of Debtor and the Parkside Partners in making Plaintiffs' investments as aforesaid and continuing to shop for the new mezzanine financing for the Parkside Project. No investor or individual would have invested with Debtor if a full and candid disclosure of the undisclosed facts had been made prior to the date of Plaintiffs' investment.

57. As a direct and/or proximate result of relying on Debtor and his partners' misrepresentations and/or omissions, Plaintiffs have been damaged in a sum exceeding $2.5 million.

58. Further, the Judgment has already been deemed non-dischargeable in the Prior Adversary Proceeding.

59. Accordingly, Plaintiffs are entitled to a determination that the Judgment remains non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered as follows:

1. The Judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2).
2. For costs of suit incurred;
3. For punitive damages to the extent permissible under applicable law; and
4. For such other and further relief as is just and proper.

//
//
//
//

Dated: April 27, 2023

WALLIN & RUSSELL LLP

By _____
MICHAEL WALLIN
Attorneys for Plaintiffs
THOMAS I. MCKNEW, IV and LISA A. MCKNEW

# EXHIBIT A

| | |
|---|---|
| 1 | JAMES ANDREW HINDS, JR. (SBN 71222) |
| | jhinds@jhindslaw.com |
| 2 | PAUL R. SHANKMAN (SBN 113608) |
| | pshankman@jhindslaw.com |
| 3 | HINDS & SHANKMAN, LLP |
| 4 | Attorneys and Counselors |
| | 21515 Hawthorne Blvd., Suite 1150 |
| 5 | Torrance, California 90503 |
| | Telephone: (310) 316-0500 |
| 6 | Facsimile: (310) 792-5977 |



**FILED & ENTERED**

APR 03 2014

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gae       DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 2:12-bk-16195-RK |
| | ) | |
| DAVID A. WILSON, | ) | (Chapter 7) |
| | ) | |
| | ) | Adv. No. 2:12-ap-01317-RK |
| Debtor. | ) | |
| | ) | |
| THOMAS I. MCKNEW, IV and LISA | ) | **AMENDED JUDGMENT IN FAVOR** |
| A. MCKNEW, individually and as | ) | **OF PLAINTIFFS AND AGAINST** |
| Trustees of the MCKNEW FAMILY | ) | **DEFENDANT BASED ON** |
| TRUST DATED MAY 21, 2004, | ) | **MEMORANDUM DECISION ON** |
| | ) | **ADVERSARY COMPLAINT FOR** |
| | ) | **NONDISCHARGEABILITY OF DEBTS** |
| Plaintiffs, | ) | |
| vs. | ) | DATE:    October 29, 2013 |
| | ) | TIME:    3:00 p.m. |
| DAVID A. WILSON, | ) | PLACE:   CRTM # 1675 |
| | ) | |
| Defendant. | ) | |

This adversary proceeding came on for trial before the undersigned United States Bankruptcy Judge on February 2, 2012, February 3, 2012, February 6, 2012, August 30, 2012, August 31, 2012, and September 6, 2012, on the complaint of plaintiffs Thomas I. McKnew IV and Lisa A. McKnew, individually and as Trustees of the McKnew Family

Trust dated May 21, 2004 (hereinafter referred to as the "Plaintiffs"), to determine dischargeability of the debts of debtor David A. Wilson (hereinafter referred to as either "Wilson" or the "Defendant") pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6). Appearances were as noted on the record. After the close of evidence, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law. The court took the matter under submission on March 7, 2013 after the last post-trial brief was filed.

On September 27, 2013, the Court issued its Memorandum Decision on Adversary Complaint for Nondischargeability of Debts (hereinafter referred to as the "Memorandum Decision") and found that Wilson's debt owed to Plaintiffs was nondischargeable under 11 U.S.C. § 523(a)(2)(A), thereby finding that Wilson's misrepresentation actually and proximately damaged Plaintiffs in the amount of $2,500,000.00 plus attorneys' fees, pre-judgment interest, and costs of suit to be determined by further Order of this Court. See Court Docket Item No. 221. The Court entered a Judgment based on the Memorandum Decision (hereinafter referred to as the "Judgment") on October 10, 2013. See Court Docket Item No. 237.

On December 2, 2013, Plaintiffs filed a Bill of Costs requesting costs in the amount of $14,587.70. See Court Docket Item No. 252. On December 17, 2013, the Court allowed the Bill of Costs in the amount of $14,587.70. See Court Docket Item No. 262.

On October 7, 2013, Plaintiffs filed a Motion for Order Awarding Attorneys' Fees and/or to Fix Amount of Attorneys' Fees (hereinafter referred to as the "Motion for Attorneys' Fees") and a Motion for Order Awarding Pre-Judgment Interest (hereinafter referred to as the "Motion for Pre-Judgment Interest" and collectively, with the Motion for Attorneys' Fees as the "Motions"). See Court Docket Item Nos. 228 and 229, respectively. The Court

entered an Order Denying the Motion for Attorneys' Fees on December 12, 2013.  See Court Docket Item No. 256.

On February 3, 2014, the Court issued its Statement of Decision on the Motion for Pre-Judgment Interest (hereinafter referred to as the "Pre-Judgment Interest Decision") finding that the Plaintiffs are entitled to pre-judgment interest at a rate of 7% simple interest per annum on the $2,500,000.00 of damages from their loss commencing April 30, 2009.  See Court Docket Item No. 278 at pg. 3.  The Court also determined that the interest on the debt did not cease as of the filing of the Debtor's bankruptcy petition.  See id.

On February 26, 2014, the Court entered an Order on the Pre-Judgment Interest Decision, Ordering that: **(1)** Plaintiffs are entitled to pre-judgment simple interest on the non-dischargeable debt of $2,500,000.00 owed to them at a rate of 7% per annum, commencing April 30, 2009; **(2)** the pre-judgment interest on the debt does not cease as of the filing of the bankruptcy petition; and **(3)** an Amended Judgment in favor of the Plaintiffs shall issue consistent with this Order.  See Court Docket Item No. 284.

The Court having fully considered all of the oral and documentary evidence presented by the parties, the legal points and authorities submitted by counsel, the argument of counsel, and being fully advised, the Court having issued its Memorandum Decision, its Judgment, its Order Denying Attorneys' Fees, its Pre-Judgment Interest Decision, its Order Granting Pre-Judgment Interest, the Court having reviewed the Declaration of Brian Yeretzian in Support of Amended Judgment, and good cause appear therefor,

**IT IS ORDERED AND ADJUDGED** that on their claim for relief under § 523(a)(6) Plaintiffs abandoned this claim and shall take nothing against the Defendant.

3

**IT IS ORDERED AND ADJUDGED** that on their claim for relief under § 523(a)(2)(B) Plaintiffs take nothing against the Defendant.

**IT IS ORDERED AND ADJUDGED** that on their claim for relief under § 523(a)(2)(A) the court finds by a preponderance of the evidence that Wilson represented he would perform his contractual obligations under the Cash Infusion Agreement, including selling or refinancing his Residence or the his Office property and thus, the court finds by a preponderance of the evidence that Wilson's misrepresentation actually and proximately damaged Plaintiffs in the amount of $2,500,000.00 plus: (1) $0.00 in attorneys' fees; (2) $845,270.35 in pre-judgment interest through February 26, 2014, accruing at $475.45 per day, and $14,587.70 in costs of suit.

**IT IS ORDERED AND ADJUDGED** that on their claim for relief under § 523(a)(4) Plaintiffs take nothing against the Defendant.

**IT IS SO ORDERED.**

\# \# \#

Date: April 3, 2014

_____
Robert Kwan
United States Bankruptcy Judge

4